UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Diane Otis,

       Plaintiff,

      v.                                                 Civil Action No. 5:12-CV-167

Commissioner of Social Security,

       Defendant.

## **REPORT AND RECOMMENDATION**
(Docs. 5, 9)

Plaintiff Diane Otis brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are Otis's motion to reverse the Commissioner's decision (Doc. 5), and the Commissioner's motion to affirm the same (Doc. 9).

For the reasons stated below, I recommend that Otis's motion be DENIED, and the Commissioner's motion be GRANTED.

## **Background**

Otis was forty-one years old on her alleged disability onset date of January 15, 2010. She completed high school, and thereafter obtained a graduate equivalency degree ("GED") and special job training in cosmetology. (AR 239.) Her job history consists of working as a waitress, an office clerk, and a hair stylist. She is

married, and jointly owns a chimney services business with her husband. (AR 30-31.) She has two sons who were ages seventeen and ten on the date of the administrative hearing. (AR 32-33.)

Otis suffers from pain in her left shoulder and in the back of her neck. (AR 33, 37-38.) She also has generalized joint aches and pains, including in her knees, hips, toes, ankles, and fingers. (AR 40.) She has headaches at least three times a week, and suffers from abdominal pain and numbness/tingling in her fingers. (AR 37-39, 40-41.) Otis complains that she is "really tired when [she] wake[s] up" in the morning, as she generally does not get good sleep mostly due to her shoulder pain or stomach aches as a result of taking too much Advil. (AR 42-43.) In addition to her physical pains, Otis suffers from pain-related anxiety. (AR 44, 1170.)

In November 2010, Otis filed applications for supplemental security insurance and disability insurance benefits. In a Disability Report form, she alleged that, although she was still working, she made changes in her work activity starting on November 15, 2009 due to the following conditions: mixed connective tissue disease ("MCTD")[1]; arthritis in her back, neck, knees, and joints; and "possible fibromyalgia." (AR 238.) Otis explained that she "[was] becoming very limited [in her] ability to work more than 2 hours per day," and that she "could not work at all from January 2010 until July 2010." (AR 246.) Consistently, in a Work Activity Report, Otis stated that she could not work because she

---

[1] Mixed connective tissue disease features signs and symptoms of a combination of disorders; early indications may include a general feeling of fatigue and being unwell, cold and numb fingers, swollen fingers, muscle aches and pains, and joint swelling and pain. Mayo Clinic Staff, *Mixed Connective Tissue Disease* (May 30, 2012), http://www.mayoclinic.com/health/mixed-connective-tissue-disease/DS00675.

2

was "in bed for two months starting in Jan[uary] 2010," and that when she returned to work in July 2010, she "could not work more than 2 [hours] a day without being in extreme pain." (AR 216.)

Otis's application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on December 6, 2011 by Administrative Law Judge ("ALJ") Debra Boudreau. (AR 25-46.) Otis appeared and testified, and was represented by an attorney. On December 20, 2011, the ALJ issued a decision finding that Otis was not disabled under the Social Security Act from her alleged onset date of January 15, 2010 through the date of the decision. (AR 10-19.) Thereafter, the Appeals Council denied Otis's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1-3.) Having exhausted her administrative remedies, Otis filed the Complaint in this action on July 27, 2012. (Doc. 1.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d).

The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Boudreau first determined that Otis had not engaged in substantial gainful activity since her alleged onset date of January 15, 2010. (AR 12.) At step two, the ALJ found that Otis had the severe impairments of MCTD and degenerative disc disease of the cervical spine. (*Id.*) Conversely, the ALJ found that Otis's hypothyroid disease, cubital tunnel syndrome, gastroesophageal reflux disease, and anxiety, were non-severe, as they did not cause more than minimal limitation

in Otis's ability to perform basic work activities. (AR 13-14.) At step three, the ALJ found that none of Otis's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 14-15.) Next, the ALJ determined that Otis had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Otis] is limited to standing and walking for a total of 4 hours during an 8-hour day and may need to change positions hourly for 1-2 minutes at a time without leaving her work station. She can sit with normal breaks for 6 hours during an 8-hour day. She is limited to occasionally pushing and pulling with the upper extremities. She can occasionally climb ladders and scaffolds. She can occasionally crawl. She has no limitations on her ability to climb stairs or ramps, balance, stoop, kneel or crouch. She can reach overhead occasionally with each upper extremity and has no other limitations with regard to manipulation. She should avoid concentrated exposure to vibration.

(AR 15.) Given this RFC, the ALJ found that Otis was capable of performing her past relevant work as an office clerk, as that job is generally performed. (AR 17.) The ALJ concluded that Otis had not been under a disability from the alleged onset date of January 15, 2010 through the date of the decision. (AR 18.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of

5

substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## **Analysis**

Otis argues that the ALJ failed to apply the correct legal standard in weighing the opinions of treating rheumatologist Dr. Teresa Fama, M.D. and treating chiropractor Dr. Daniel Woodcock, D.C. The Commissioner disagrees, and further asserts that the ALJ's RFC determination and credibility assessment are supported by substantial evidence.

**I.      The ALJ Properly Considered Dr. Fama's Opinion.**

Dr. Fama, a rheumatologist, treated Otis's MCTD and other related problems since October 2007, meeting with Otis approximately every four-to-six months.  (AR 1150.)  In November 2011, Dr. Fama completed a form titled "Fibromyalgia Medical Source Statement."  (AR 1150-54.)  Therein, Dr. Fama stated that Otis met the diagnostic criteria for fibromyalgia and MCTD.  (AR 1150.)  The Doctor opined that, because of her MCTD and fibromyalgia, Otis could walk for only half a mile without rest or severe pain; and could sit and stand for only forty-five minutes to an hour at one time, and for less than two hours total in an eight-hour workday.  (AR 1151-52.)  Dr. Fama further opined that Otis required the ability to shift positions at will from sitting, standing, or walking; and needed to walk for approximately ten minutes every forty-five minutes of an eight-hour workday.  (AR 1152.)  Dr. Fama opined that Otis could lift and carry only less than ten pounds frequently, up to ten pounds occasionally, and up to twenty pounds rarely; and required manipulative and postural restrictions.  (AR 1152-53.)  Finally, Dr. Fama opined that, as a result of her MCTD and fibromyalgia, Otis was likely to be absent from work for two-to-three days each month.  (AR 1153.)

Given that Dr. Fama was a rheumatologist who treated Otis during the alleged disability period, the ALJ was required to assess her opinion under the treating physician rule.  That rule states that a treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567-69 (2d Cir. 1993).  I

7

find that the ALJ properly applied this rule, explicitly stating that Dr. Fama's opinion was "not well-supported by her own clinical observations" and "inconsistent with other substantial evidence." (AR 17.)

When an ALJ decides to afford less than controlling weight to a treating physician's opinion, the ALJ must consider the regulatory factors in determining how much weight is appropriate. *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw*, 221 F.3d at 134; 20 C.F.R. § 404.1527(c)(2)-(6)). These factors include but are not limited to: the length and extent of the treatment relationship, the frequency of examination, whether the opinion is supported by explanation or evidence, and whether the opinion is consistent with the record as a whole. *Id.* Here, the ALJ was clearly aware that Dr. Fama was a physician who had a treatment relationship with Otis, given that she analyzed Dr. Fama's opinion under the treating physician rule and considered Dr. Fama's treatment notes. (*See* AR 17 (citing SSR 96-2p and accurately stating the treating physician rule).) Otis challenges the ALJ's discussion of merely the supportability and consistency factors, to the exclusion of the other regulatory factors such as the length of treatment relationship and frequency of examination. (Doc. 5 at 12.) But, as the Second Circuit recently re-emphasized: "We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, No. 12-902-cv, 2013 WL 628072, at *2 (2d Cir. Feb. 21, 2013) (citing *Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004)). The ALJ's decision clearly states her reasoning and adherence to the applicable regulatory

law, and thus she was not required to explicitly consider every regulatory factor in assessing the weight of Dr. Fama's opinion.

Without citing any supporting authority, Otis argues that, although a medical opinion's consistency and supportability are relevant in determining whether the opinion is entitled to controlling weight under the treating physician rule, these factors are *not* relevant in situations like this, where the ALJ determines that the opinion is deserving of less than controlling weight. (Doc. 5 at 12 ("The factors that the ALJ cites are not the factors that must be considered for concluding [that] Dr. Fama's opinion is entitled to little weight. Rather, they are the factors for considering whether her opinion is entitled to controlling weight.").) As discussed above, however, these factors are also relevant in determining—after it has been determined that the opinion is not entitled to controlling weight—what lesser weight the opinion should be afforded. *See* 20 C.F.R. § 404.1527(c)(2)-(6). Therefore, I find that the ALJ did not err in considering whether Dr. Fama's opinion was consistent with the record and supported by her own treatment notes in determining how much weight to afford to that opinion.

Moreover, I find that substantial evidence supports the ALJ's findings that Dr. Fama's opinion is not supported by her own treatment notes and is inconsistent with other substantial evidence. (AR 17.) For example, as discussed in the ALJ's decision, Dr. Fama's treatment note from October 2011 states that Otis had full range of motion in her hands, wrists, and extremities; no significant muscle spasm and no crepitus in the shoulders; and only mild cubital tunnel syndrome. (AR 1100-01.) The note further states that a chiropractor had been helping with Otis's arm and shoulder pain, but Otis had

9

stopped treatment due to insurance problems. (AR 1099.) The only treatment recommended by Dr. Fama at that time was Advil, Tylenol, and chiropractic care; and if insurance would not cover chiropractic care, occipital nerve block therapy. (AR 1102.) The note indicates that follow-up was not needed for another six months. (*Id.*) Other of Dr. Fama's treatment notes state as follows: Otis's chronic headaches and back/neck pain were relieved with consistent chiropractic treatment (AR 383, 1098); Otis had "full painless [range of motion] of upper and lower extremities" (AR 384, 388, 390); Dr. Fama anticipated that Otis's symptoms would resolve (AR 388 ("This should resolve with time and continued chiropractor manipulation."), 393 ("Reassured [Otis] that this will continue to resolve over the next 1-2 weeks.")); anxiety and depression "certainly could [have] be[en] playing a major role in [Otis's] symptomology" (AR 390); and Otis's symptoms could have been related to "increased stress at home" (*id.*).

These and other of Dr. Fama's treatment notes, taken as a whole, do not reflect the severe functional limitations stated in Dr. Fama's November 2011 opinion. Treatment notes from other medical providers also do not reflect such severe functional limitations, instead documenting mostly normal physical findings (despite many subjective complaints) upon medical examination—including full range of motion in the back, neck, and extremities; no tenderness in the back; normal sensation and strength; and no neurologic abnormalities—and anxiety/stress related to events occurring in Otis's life. (*See, e.g.*, AR 294, 311, 316, 320, 325, 329, 333, 337, 341-45, 354, 1007, 1085, 1097, 1100.) Although Otis frequently complained of abdominal pain during the alleged

10

disability period, she had a negative urinalysis, colonoscopy, gallbladder ultrasound, and abdomen CT; and she tested negative for celiac disease. (AR 316, 341, 386.)

Otis claims that the ALJ erred in weighing the opinion of non-examining agency physician Dr. Ann Fingar more heavily than that of Dr. Fama. (Doc. 5 at 12-14.) In March 2011, Dr. Fingar reviewed Otis's records and assessed her RFC as follows: in an eight-hour workday, Otis could lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and walk for four hours; and sit for approximately six hours. (AR 75.) Dr. Fingar stated that Otis "[m]ust periodically alternate sitting and standing to relieve pain and discomfort," and "[m]ay need to change positions for 1-2 min[utes] hourly." (*Id.*) Dr. Fingar further stated that Otis could only occasionally push and pull with her upper extremities, and was limited in her ability to reach overhead. (AR 75-76.)

Otis asserts that, "[i]f the proper factors are applied, then a reasonable ALJ should find that Dr. Fama's opinion is entitled to far greater weight than Dr. Fingar's." (Doc. 5 at 12; *see also* Doc. 10 at 3 ("we have . . . shown why the application of the [regulatory] factors . . . should lead a reasonable ALJ to conclude that the similar opinions [of] Dr. Fama and Dr. Woodcock should be entitled to greater weight").) This argument fails for two principal reasons. First, the standard is not what a "reasonable ALJ" would find, but rather, whether: (a) the ALJ applied the correct legal standard, and (b) substantial evidence supports the ALJ's decision. *Machadio*, 276 F.3d at 108 (citing *Shaw*, 221 F.3d at 131); *see* 42 U.S.C. § 405(g). The Second Circuit explained: "The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that

of the [Commissioner], and to reverse an administrative determination only when it does not rest on adequate findings sustained by evidence having rational probative force." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quotation omitted). Therefore, if the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists. *See Alston*, 904 F.2d at 126 ("Where there is substantial evidence to support either position, the determination is one to be made by the fact finder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998).

Second, although in many cases it is most appropriate for the ALJ to give less weight to the opinion of a non-examining agency consultant than to that of a treating physician, this determination must be made on a case-by-case basis; and the regulations permit the opinion of a non-examining agency consultant to override that of a treating physician, when the former is supported by the record and the latter is not. *See* SSR 96-6p, 1996 WL 374180, at *3 (1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); 20 C.F.R. § 404.1527(e)(2)(i) (state agency medical consultants are "highly qualified physicians . . . who are also experts in Social Security disability evaluation"). In this case, for the reasons stated above, I find that Dr. Fama's opinion is not supported by the record. Conversely, I find that Dr. Fingar's opinion is supported by the record, particularly Otis's self-reported daily activities, including doing laundry, making beds, dusting, vacuuming, shopping for groceries, preparing meals for herself and her family, caring for her dogs, dropping off and picking up her children. (*See* AR 229-

32, 247-50.) Thus, I find that it was proper for the ALJ to give more weight to the opinion of consultant Dr. Fingar than to that of Dr. Fama.[2]

Finally, I note that Dr. Fama's treatment notes are based largely on Otis's self-reporting about her pain levels and other symptoms. (*See, e.g.*, AR 386 ("*she says* she still gets intermittent pain at left shoulder blade, any time during the day"; "*[s]he says* she wakes up with numbness in left small finger") (emphases added).) Therefore, the value of these notes is largely dependent on Otis's credibility. Yet the ALJ found that Otis was not entirely credible (AR 16), and Otis does not dispute this finding in her motion (Doc. 5). In response to the Commissioner's credibility argument (Doc. 9-1 at 11-12), Otis asserts in her reply that the ALJ did not properly assess her credibility (Doc. 10 at 1, 3-7). I address the ALJ's credibility assessment below, and find that the ALJ did not err in determining that Otis was not entirely credible.

## II.    The ALJ Properly Considered Dr. Woodcock's Opinion.

Next, Otis argues that the ALJ failed to properly analyze the opinion of her treating chiropractor, Dr. Woodcock. The ALJ gave "little weight" to Dr. Woodcock's opinion "[f]or similar reasons" that she gave little weight to Dr. Fama's opinion. (AR 17.)

Otis started treating regularly with Dr. Woodcock in March 2010 for finger numbness; abdominal discomfort; and pain in her left shoulder, lower back, and upper arm. (AR 1160.) In November 2011, Dr. Woodcock completed a "Physical Impairment

---

[2] I similarly find that it was proper for the ALJ to give more weight to the opinion of Dr. Fingar than to that of Otis's treating chiropractor, Dr. Woodcock, discussed *infra*.

13

Medical Source Statement," wherein he opined, like Dr. Fama, that Otis's fibromyalgia symptoms caused significant functional limitations. (AR 1155-59.) Specifically, Dr. Woodcock opined that Otis could walk for only one-quarter of a mile without rest or severe pain; and could sit and stand for only forty-five minutes to one hour at a time and for less than two hours total in an eight-hour workday. (AR 1156-57.) Dr. Woodcock further opined that Otis required the ability to shift positions at will from sitting, standing, or walking; and needed to take unscheduled breaks during an eight-hour workday. (AR 1157.) Dr. Woodcock stated that Otis could lift and carry only less than ten pounds frequently, up to ten pounds occasionally, and up to twenty pounds rarely; and required manipulative and postural restrictions. (AR 1158.) Finally, Dr. Woodcock opined that, as a result of her pain and other symptoms, Otis was likely to be absent from work for three or more days each month. (AR 1159.)

As a chiropractor and not an "acceptable medical source," Dr. Woodcock could not provide a "medical opinion," and thus the ALJ was not required to afford controlling weight to his opinion. *Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995) (citing 20 C.F.R. §§ 404.1513, 404.1527(a)(2)). The Second Circuit explained: "[W]hile the ALJ is certainly free to consider the opinions of . . . 'other sources' [such as chiropractors] in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician." *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (citation omitted). Nonetheless, the Commissioner has deemed chiropractor opinions "important" and deserving of consideration on issues such as impairment severity and functional effects, particularly

14

where they are consistent with the medical opinions of treating physicians such as Dr. Fama here. SSR 06-03p, 2006 WL 2329939, at *3-4 (Aug. 9, 2006); 20 C.F.R. § 404.1513(d)(1). Generally, ALJs are required to "explain the weight given to" the opinions of "other sources" such as chiropractors, "or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, at *6. ALJs may use the same factors to evaluate "other source" opinions as are used to evaluate treating physician opinions. *Id.* at *4 (citing 20 C.F.R. § 404.1527(d)).

Applied here, I find that the ALJ did not err in her analysis of Dr. Woodcock's opinion: the ALJ stated that she gave "little weight" to the opinion for "similar reasons" that she gave little weight to Dr. Fama's opinion, i.e., because it was not well-supported by Dr. Woodcock's own treatment notes and was inconsistent with other substantial evidence. (AR 17.) As discussed above, these are two of the several factors that ALJs consider in evaluating the reliability of a medical source's opinion. *See* 20 C.F.R. § 404.1527(c)(3)-(4). Otis cites no legal authority, and I am aware of none, prohibiting an ALJ from using the same reasons to discredit the opinions of multiple medical sources, particularly where, as here, the opinions are substantially similar. (*Compare* AR 1150-54 *with* 1155-59.) Moreover, as Dr. Fama's treatment notes did not support the severe functional limitations contained in her opinion, Dr. Woodcock's treatment notes also do not support the severe functional limitations contained in his opinion. To the contrary, Dr. Woodcock's notes contain many statements that indicate Otis was improving and

15

adequately managing her symptoms. (*See, e.g.*, AR 1160 ("feeling better," "some cont'd improv't"), 1161 ("steady improv't," "doing better," "slow/steady progress," "feeling pretty good," "been doing better [with pain] levels"), 1168 ("doing OK except for PT exercises which [increase pain]," "doing fair").) Likewise, Otis herself stated in a May 2011 "Treatment Update" form that Dr. Woodcock had "made things feel better for [a] long length of time without [my] having to take so many pain meds in a day." (AR 1167.) Otis further stated that, although her pain level was still sometimes as high as an eight, she had decreased the frequency of appointments with Dr. Woodcock from every week to every other week, "with the hope [that,] by the end of [the] summer," she would need to see Dr. Woodcock only "every 3 to 4 weeks." (*Id.*)

Again, it should be acknowledged that Dr. Woodcock's treatment notes—like Dr. Fama's—are primarily based on Otis's self-reporting. (*See* AR 1160-69.) Their value is thus dependent on Otis's credibility, which the ALJ properly found to be questionable, as discussed below.

### III. The ALJ Properly Assessed Otis's Credibility, and Substantial Evidence Supports that Assessment.

The ALJ found that, although Otis's medically determinable impairments could reasonably be expected to cause the alleged symptoms; her statements concerning the intensity, persistence, and limiting effects of those symptoms "are not credible to the extent they are inconsistent with the [ALJ's RFC] assessment." (AR 16.) The Commissioner asserts that this assessment of Otis's credibility is legally correct and supported by substantial evidence. (Doc. 9-1 at 11-12.) Otis disagrees, arguing that the

16

ALJ's credibility assessment is based on incomplete or inaccurate representations of the record, and thus is not supported by substantial evidence. (Doc. 10 at 3-7.)

It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Thus, if the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)). "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).

Here, the ALJ appears to have considered the entire record, and gave specific reasons in support of her credibility determination. First, the ALJ accurately noted that, although Otis testified at the administrative hearing that, since January 2010, it was "[m]ostly" her husband who prepared meals at her home (AR 34); she inconsistently wrote in her November 2010 and February 2011 Function Reports that *she* prepared meals for her family at least every other day (AR 229, 231, 248-49). Specifically, Otis made the following statements about preparing meals in her Function Reports: "do something for dinner" (AR 229); "[prepare] sandwiches, dinners . . . every other day[,] Husband helps" (AR 231); "make dinner" (AR 247); "fix dinner" (AR 248); and "[prepare] soup, sandwiches, meatloaf, spag[hetti], [and] chicken . . . every other day" (AR 249). It was proper for the ALJ to consider the consistency of Otis's statements in

determining her credibility. *See* SSR 96-9p, 1996 WL 374186, at *5 (July 2, 1996) ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."). The ALJ also properly considered Otis's daily activities in assessing her credibility, accurately noting that Otis reported "spen[ding] time doing tasks such as laundry, cleaning, doing the dishes[,] and taking her children to school," as well as vacuuming, dusting, and making dinner. (AR 16.) *See Calabrese v. Astrue*, 358 F. App'x 274, 278 (2d Cir. 2009) (citing 20 C.F.R. § 404.1529(c)(3)) ("in assessing the credibility of a claimant's statements, an ALJ must consider, *inter alia*, the claimant's daily activities").

As part of her credibility assessment, the ALJ also considered Otis's collection of unemployment compensation during a period when she alleged she was disabled, stating that this "cast[] doubt on [Otis's] veracity." (AR 17.) Courts in this circuit and others have held that a social security disability claimant's collection of unemployment benefits may be considered in assessing a claimant's credibility, although it should not be the determinative factor. *See Felix v. Astrue*, 11-CV-3697 (KAM), 2012 WL 3043203, at *10 (E.D.N.Y. July 24, 2012) (citing cases) ("Courts in the Second Circuit have held that an ALJ may consider evidence that the claimant received unemployment benefits and/or certified that he was ready, willing, and able to work during the time period for which he claims disability benefits[,] as adverse factors in the ALJ's credibility determination."); *Perez v. Sec'y of Health, Educ. & Welfare*, 622 F.2d 1, 3 (1st Cir. 1980) ("although we have reservations about the significance of such evidence, we are reluctant to say that a claimant's decision to hold himself out as able to work for the purpose of receiving

18

unemployment benefits may never be considered on the issue of disability"). Given this law and the inherent inconsistency in Otis's pursuit of unemployment and disability benefits for the same period, the ALJ did not err in considering this factor as one of many relevant to assessing Otis's credibility.

Finally, the ALJ found Otis less than credible because she failed to report the business she jointly owned with her husband, Chimney Care, as an asset in her application for supplemental security income ("SSI"). (AR 17 (citing AR 170-80).) The ALJ stated: "In fact, [Otis] even indicated that she did not have a contact number for this employer," i.e., her husband. (AR 17 (citing AR 172).) Despite Otis's argument that, based on other evidence filed with her SSI application, "[n]o reasonable person could conclude that [Otis] was trying to hide her role in Chimney Care Inc." (Doc. 10 at 7), these were proper facts for the ALJ to consider in assessing Otis's credibility. I find no error, and certainly no error to the degree found in *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010), cited by Otis in her reply (Doc. 10 at 3). In *Genier*, the Second Circuit found that the ALJ's decision was "based on so serious a misunderstanding of [the claimant's] statements that it cannot be deemed to have complied with the requirement that they be taken into account." 606 F.3d at 50. That "misunderstanding" included the ALJ's statement that the claimant had indicated in a questionnaire that he was able to care for his dogs, vacuum, do dishes, cook, and do laundry, when in fact, the claimant had merely indicated on the questionnaire that he *tried to* do these activities but required the assistance of a parent to actually complete them. *Id.* Here, there was no such "serious misunderstanding" of the record which affected the ALJ's decision.

In sum, the ALJ's decision is sufficiently detailed to discern the reasons on which the ALJ relied in finding Otis not entirely credible. Moreover, there is substantial evidence, including Otis's daily activities, to support the ALJ's decision to discredit Otis's allegations of severe functional limitations. While another fact-finder could view this evidence in a light more favorable to Otis, the court may not substitute its own credibility determination for that of the ALJ's unless the latter was "patently unreasonable." *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable.") (quotation marks omitted).

## Conclusion

For these reasons, I recommend that Otis's motion (Doc. 5) be DENIED, the Commissioner's motion (Doc. 9) be GRANTED, and the decision of the Commissioner be AFFIRMED.

Dated at Burlington, in the District of Vermont, this 8th day of April, 2013.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).