UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 JUN -3 PM 2: 49

CLERK
~PC~

BY_____
DEPUTY CLERK

Diane Otis,                                    )
                                               )
           Plaintiff,                          )
                                               )
    v.                                         )        Case No. 5:12-cv-167
                                               )
Social Security Administration, Commissioner   )
                                               )
           Defendant.                          )

## ORDER ADOPTING IN PART MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, DENYING PLAINTIFF'S MOTION TO REVERSE COMMISSIONER, AND GRANTING COMMISIONER'S MOTION TO AFFIRM
(Docs. 5, 9, & 11)

This matter came before the court on the Objection of Plaintiff Diane Otis (Doc. 12), to the Magistrate Judge's April 8, 2013 Report and Recommendation (the "R & R") (Doc. 11). In the R & R, the Magistrate Judge recommended denying Plaintiff's motion for an order reversing the decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner") (Doc. 5) and granting the Commissioner's motion to affirm the same. (Doc. 9.)

Plaintiff objects to the R & R, contending that (1) the Administrative Law Judge ("ALJ") committed legal error by failing to follow the correct legal standard in evaluating the opinion of Plaintiff's treating physician, Teresa Fama, M.D.; (2) the ALJ committed legal error by failing to adequately explain the weight given to the opinion of Plaintiff's chiropractor, Dr. Daniel Woodcock, or to cite to any part of the record from which that explanation may be derived; and (3) the ALJ's legal errors were not harmless.

Plaintiff is represented by Craig A. Jarvis, Esq. Defendant is represented by Special Assistant United States Attorney Luis Pere.

## I.     Factual and Procedural Background.

Plaintiff was forty-one years old on her alleged disability onset date of January 15, 2010. She has completed high school and obtained a graduate equivalency degree ("GED"), as well as additional job training in cosmetology. Plaintiff's work history includes positions as a waitress, an office clerk, and a hair stylist. Plaintiff currently owns a chimney services business with her husband. Although Plaintiff previously provided office services for the chimney business, she no longer does so.

Plaintiff suffers from pain in her knees, hips, toes, ankles, left shoulder, and in the back of her neck. She also has headaches at least three times a week, and suffers from abdominal pain and numbness/tingling in her fingers. Plaintiff takes Advil and Tylenol for these symptoms. She reports that she generally suffers from poor sleep because of her shoulder pain, as well as from stomach aches which occur when she takes too much Advil for her symptoms. In addition to physical pain, Plaintiff suffers from pain-related anxiety.

In November 2010, Plaintiff filed applications for supplemental security income and disability insurance benefits. Plaintiff alleges that as of her initial onset date of January 15, 2010, her work activity began suffer due to arthritis in her back, neck, knees, and joints, mixed connective tissue disease ("MCTD")[1] and "possible fibromyalgia." (AR 238.) Plaintiff alleged that she was unable to work from January 2010 to July 2010, and that due to her ongoing symptoms she currently could not work more than two hours per day without being in extreme pain.

Plaintiff's application was denied initially and upon reconsideration, after which she timely requested an administrative hearing. On December 6, 2011, a hearing was

---

[1] Mixed connective tissue disease features signs and symptoms of a combination of disorders; early indications may include a general feeling of fatigue and being unwell, cold and numb fingers, swollen fingers, muscle aches and pains, and joint swelling and pain. Mayo Clinic Staff, *Mixed Connective Tissue Disease* (May 30, 2012), http://www.mayoclinic.com/health/mixed-connective-tissuedisease/DS00675.

conducted before ALJ Debra Boudreau, during which time Plaintiff testified via videoconference and was represented by counsel.

The court does not recite Plaintiff's full medical history but, instead, recites only those portions of that history that are relevant to Plaintiff's pending Objection.

## A.    Dr. Fama's Opinions and Treatment Notes.

The record before the ALJ included the November 2011 opinion of Dr. Fama, Plaintiff's treating rheumatologist since October of 2007, set forth in a form titled "Fibromyalgia Medical Source Statement." (AR 1150.) In her opinion, Dr. Fama noted that she saw Plaintiff every four to six months and that Plaintiff met the diagnostic criteria for MCTD and fibromyalgia and had suffered from these impairments since Plaintiff's last day of work on January 15, 2010. She described Plaintiff's prognosis for MCTD as "good" and her prognosis for Fibromyalgia as "[f]air." (AR 1150). Dr. Fama identified the "clinical findings, laboratory and test results" which documented Plaintiff's medical impairments to include a diagnosis of Raynaud's syndrome and MCTD and a second group of findings identified as "significant left upper scapula pain, neck pain, intermittent left arm numbness, [fourth and fifth] finger numbness, headaches, fatigue, IBS and chronic myofascial pain." (AR 1150.)

In her November 2011 opinion, Dr. Fama concluded that Plaintiff's impairments restricted her from walking for more than half a mile without rest or severe pain; limited her to sitting or standing for approximately forty-five minutes to an hour at one time and less than two hours total in an eight-hour workday; and that Plaintiff could lift and carry less than ten pounds frequently, up to ten pounds occasionally, and up to twenty pounds rarely. Dr. Fama opined that Plaintiff would only be able to occasionally or rarely look down or up, side to side, or hold her head in a static position during an eight-hour work day, could only occasionally crouch, and could never climb ladders. In addition, she opined that during a normal workday, Plaintiff could reach in front of her body approximately eighty percent of the time and could reach overhead approximately ten percent of the time. Dr. Fama opined that Plaintiff needed to walk for approximately ten minutes at forty-five minute intervals in an eight-hour workday, and would require a job

allowing her to shift positions at will from sitting, standing, or walking. Finally, she opined that Plaintiff would need to take unscheduled work breaks from each work day, and would likely be absent from work two to three days each month.

Dr. Fama's treatment notes dated October 11, 2011, one month prior to her November 2011 opinion, indicate "Raynauds has been okay. Continues w/sudden onset left parietal, occipital headaches-sinus?" (AR 1099.) Her notes further indicate that Plaintiff's chiropractic treatment was "helping" with both her headaches and her left shoulder pain, but that Plaintiff had stopped going to the chiropractor because of insurance coverage issues. Dr. Fama reported that Plaintiff had undergone a series of diagnostic tests that yielded no abnormal test results beyond EMG testing which showed "mild cubital tunnel" which Dr. Fama found "again, this is not likely contributing to her scapula and shoulder symptoms." (AR 1101.) Dr. Fama's musculoskeletal exam revealed "no soft tissue swelling in hands, wrists; full ROM [range of motion] of upper and lower extremities. No significant muscle spasms at left rhomboids, no crepitus at lower shoulder blade." (AR 1100.) Dr. Fama recommended that Plaintiff continue with her chiropractor and if she was unable to obtain insurance coverage for that treatment, to reconsider an occipital nerve block "to see if any relief, at least with episodic headaches and left-sided shoulder pain." (AR 1102.)

Dr. Fama's 10/11/11 treatment notes are consistent with a "To Whom This Will Concern" letter authored by her on September 19, 2011 wherein she stated: "Ms. Otis carries a diagnosis of cervical spondylosis, with moderate foraminal narrowing on C5-C6 right. This contributes to chronic headaches, for which she has had relief with consistent chiropractic treatment." (AR 1098.)

Dr. Fama's other treatment notes reflect a consistent conclusion that the etiology of many of Plaintiff's symptoms was unclear. On April 7, 2011 Plaintiff reported to Dr. Fama that she was "still dealing with neck and shoulder problems" but that with chiropractic treatment, Plaintiff's pain level was reduced from a "6/10 to 3/10." (AR 1105.) Dr. Fama noted that an MRI revealed bilateral uncovertebral joint hypertrophy, "mild to moderate" bilateral foraminal narrowing at C5-6 and "mild stenosis" at C6-7

4

"[h]owever, not clear if symptoms coming from this." (AR 1105.) She observed that a "nerve conduction showed mild cubital tunnel bilaterally but wouldn't explain rib cage and shoulder symptoms." (AR 1105.) Her musculoskeletal examination on that date revealed "no soft tissue in swelling in hands, wrists; full ROM of upper and lower extremities except in shoulders where ROM is full but she has discomfort bilaterally. No weakness or pain with resisting ROM in left shoulder. Muscle spasms at left rhomboids, no crepitus at lower shoulder blade." (AR 1106.) Dr. Fama concluded that with regard to Plaintiff's left upper scapula pain, the "etiology [was] unclear" and that although she "initially did not think the upper back and shoulder symptoms were consistent with fibromyalgia; however, given her lack of improvement, number of tests with inconclusive findings, and characteristics of the pain, I am thinking this may be the case. Will try mild muscle relaxant to see if any benefit." (AR 1106.)

Plaintiff was treated by Dr. Fama approximately six months prior to her April 7, 2011 visit. At the November 8, 2010 visit, Dr. Fama found "no soft tissue swelling in hands, wrists; full painless ROM of upper and lower extremities . . . No muscle spasms at left rhomboids, and no crepitus at lower shoulder blade." (AR 384.) Again, Dr. Fama found the etiology of Plaintiff's left upper scapula pain was "unclear" and noted that "[s]he has some fibromyalgia symptoms as well; however, I do not think this is the main culprit." (AR 384.) Both Dr. Fama and Joseph Brock, M.D., who was also Plaintiff's treating physician, observed that Plaintiff's physical symptoms appeared to be magnified by her emotional problems. *See* AR 389-90 (Dr. Fama 2/4/10: "She has been seeing Dr[.] Brock as well, and he has checked some labs (TSH, ESR, Lyme, EBV, CMP, CBC, CPK) and all were negative/normal . . . Not clear what is going on. Anxiety/depression certainly could be playing a major role in her symptomology, and there has been increased stress at home."); AR 309 (Dr. Brock 7/15/10: discussing array of tests administered to Plaintiff and their negative/normal results and noting that, "I emphasized her symptoms are magnified because of anxiety and major depression").

**B.    Dr. Woodcock's Opinion and Treatment Notes.**

In November of 2011, Plaintiff's treating chiropractor, Dr. Woodcock, completed a form titled "Physical Impairment Medical Source Statement." He noted that he had been seeing Plaintiff every two weeks "sporadically since 3/11." His opinion, however, includes a conclusion that Plaintiff's impairments existed since her last date of work on January 15, 2010 and his treatment notes support a conclusion that he has been treating Plaintiff since March 15, 2010. The duration and frequency of his treatment of Plaintiff is thus somewhat unclear. In his opinion, Dr. Woodcock stated Plaintiff suffered from "segmental [d]ysfunction in [c]ervical, [t]horacic and [l]umbar regions [with] assoc[iated] muscle spasms" and noted that "[p]atient's condition is being maintained with treatment rendered." (AR 1155.) He also noted that Plaintiff had pain in her "neck, shoulder, knee, ankle, leg, center back" but did not indicate the nature of the pain, its frequency, precipitating factors, or its severity. *Id.* Dr. Woodcock identified the "clinical findings and objective signs" which supported his opinion as "chronic repeated sublaxations" in the neck, shoulder, knee, ankle, leg, and center back with associated muscle "hypertoms [and] decreased range of motion in same." *Id.* He concluded that Plaintiff's limitations had an "insidious onset" and that emotional factors contributed to Plaintiff's symptoms and functional limitations. (AR 1156.) He found Plaintiff's physical and emotional impairments consistent with her symptoms and functional limitations, noting that "[t]his patient has undergone multiple testing techniques for a vast number of conditions. Autoimmune [disease] most likely-condition most resembles Fibromyal[gia] symptom picture." *Id.*

Dr. Woodcock identified numerous limitations on Plaintiff's ability to work, including his opinion that Plaintiff's pain would "[f]requently" interfere with the time and attention needed to perform even simple work tasks and that she was "[i]ncapable of even 'low stress' jobs" on her bad days and only "capable of low stress jobs" on her good days. (AR 1156.) He opined that Plaintiff's conditions restricted her from walking for more than one-quarter of a mile without rest or severe pain, and limited her to sitting or standing for approximately forty-five minutes to an hour at one time and less than two

hours total in an eight-hour workday. Dr. Woodcock also opined that Plaintiff could lift and carry less than ten pounds frequently, up to ten pounds occasionally, and up to twenty pounds rarely. He opined that Plaintiff would be able to occasionally look down, turn her head from left to right, stoop, crouch, or climb stairs, could only rarely look up, and could never climb ladders in an eight-hour workday. He opined that in an average workday, Plaintiff could only use her hands to grasp, turn, or twist objects between twenty and forty percent of the time, could only use her fingers for fine manipulations between zero and thirty percent of the time, and could only use her arms for reaching approximately ten percent of the time. Dr. Woodcock opined that Plaintiff needed to walk for approximately ten minutes at forty-five to sixty minute intervals in the course of an eight-hour workday, and would require a job allowing her to shift positions at will from sitting, standing, or walking. Finally, he opined that Plaintiff would need to take unscheduled work breaks from work each day, and would likely be absent from work both "[a]bout three days per month" and "[m]ore than four days per month." (AR 1159.)

    Dr. Woodcock's treatment notes include a May 25, 2011 written statement signed by Plaintiff (and apparently in her handwriting) which includes a representation that: "The chiropract[or] [h]as made things feel better for [a] long length of time without having to take so many pain meds in a day. We have gone from [once a week] to every other week with the [h]ope by the end of the summer to be down to every 3 to 4 weeks." (AR 1167.)

    Dr. Woodcock's treatment notes for November 2011, the same month that he rendered his opinion, are somewhat difficult to decipher but appear to include a report on 11/2/11 that Plaintiff's stress was elevated on the day in question and "notes some discomfort" and a note on November 16, 2011 that Plaintiff "reports that the past [two] weeks she did OK till the weekend before . . . (11/11/11) . . . still recuperating." (AR 1169.) The remainder of Dr. Woodcock's treatment notes, which are equally difficult to decipher, report periodic improvements in Plaintiff's condition followed by renewed reports of pain.

7

## C.    Dr. Ann Fingar's Opinion.

Non-examining agency physician Dr. Ann Fingar reviewed Plaintiff's records and assessed her physical capacity in March of 2011. Dr. Fingar opined that Plaintiff could stand or walk with normal breaks for approximately four hours per day, could sit with normal breaks for approximately six hours in an eight-hour workday, but would need to periodically alternate sitting and standing, and may need to shift positions for one-to-two minutes hourly. Dr. Fingar also opined that Plaintiff could lift and carry up to ten pounds frequently, and up to twenty pounds occasionally. Dr. Fingar opined that Plaintiff was limited in her ability to reach overhead, and limited in her ability to push or pull with her upper extremities, but unlimited in her ability to handle objects and exert fine manipulation with her fingers. She also opined that Plaintiff was unlimited in her ability to climb stairs, balance, stoop, kneel, or crouch, and could climb ladders or crawl occasionally. Dr. Fingar opined that Plaintiff should avoid concentrated exposure to vibration.

## D.    The ALJ's Decision.

On December 20, 2011, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act. Plaintiff requested review of the ALJ's decision, which was denied by the Appeals Council, rendering the ALJ's decision the final decision of the Commissioner. The ALJ applied the five-step analysis[2] employed by the

---

[2] The five steps are sequential such that if it is determined that a claimant has not met his or her burden of proof with regard to a particular step the analysis does not proceed further. At step one, the claimant must show she is not currently engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(I); 20 C.F.R. § 404.1520(b). If the claimant is not engaging in substantial gainful activity, the analysis proceeds to step two. At step two, the claimant must show that she suffers from a medically determinable impairment that is "severe" or a combination of impairments that are "severe." 20 C.F.R. § 404.1520(c). If the claimant has a severe impairment or a combination of impairments that are severe, the analysis proceeds to step three. At step three, a claimant must establish that her impairment or combination of impairments meets or medically equals a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). If the claimant's impairments meet or equal one of the Listings, the claimant is presumptively disabled; if not, the ALJ must determine the claimant's residual functional capacity ("RFC"), which is the claimant's ability to do physical and mental work activities on a sustained basis despite any existing mental or physical impairments. In making this finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe.

Commissioner to ascertain whether Plaintiff was disabled during the relevant time period under the Social Security Act. A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if his or her "impairments are of such severity that he [or she] is not only unable to do previous work[,] but cannot, considering his [or her] age, education, and work experience, engage in any other substantial gainful work which exists in the national economy." 42 U.S.C. 423(d)(2)(A).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 15, 2010. At step two, she found that Plaintiff had the severe impairments of MCTD and degenerative disc disease of the cervical spine. She also found that Plaintiff had several non-severe impairments, including hypothyroid disease, mild bilateral cubital tunnel syndrome, and anxiety, and concluded that these impairments caused minimal limitations in Plaintiff's ability to perform basic work activities. The ALJ determined, at step three, that since the alleged onset date, Plaintiff had no impairment or combination of impairments that met or medically equaled a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").

At step four, the ALJ made the following determination of Plaintiff's residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except the [Plaintiff] is limited to standing and walking for a total of 4 hours during an 8-hour day and may need to change

---

20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545. At step four, the ALJ must determine whether the claimant has the RFC to perform the requirements of her past relevant work. *See* 20 C.F.R. § 404.1520(f). If the claimant has the RFC to perform her past relevant work, she is not disabled. If she cannot perform her past relevant work, the ALJ considers the fifth and final step, which requires the Commissioner to establish that there is sufficient work in the national economy that the claimant can perform given her RFC, age, education and work experience. 20 C.F.R. § 404.1520(g); 20 C.F.R. § 404.1512(g); 20 C.F.R. § 404.1560(c).

positions hourly for 1-2 minutes at a time without leaving her work station. She can sit with normal breaks for 6 hours during an 8-hour day. She is limited to occasionally pushing and pulling with the upper extremities. She can occasionally climb ladders and scaffolds. She can occasionally crawl. She has no limitations on her ability to climb stairs or ramps, balance, stoop, kneel or crouch. She can reach overhead occasionally with each upper extremity and has no other limitations with regard to manipulation. She should avoid concentrated exposure to vibration.

(AR 15.)

The ALJ noted that in determining Plaintiff's RFC, she was required to follow a two-step process. At the first step, she considered whether Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's reported symptoms. At the second step, she evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which those symptoms limited Plaintiff's functioning. The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's reported symptoms. However, the ALJ did not entirely credit Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms. The ALJ found that Plaintiff made several inconsistent statements regarding her ability to perform daily tasks, and cited evidence that Plaintiff collected six months of unemployment compensation in 2010 despite her assertion that she was unable to perform tasks consistent with any work at that time. She also found incredible Plaintiff's statements that she could not even answer the telephone to take messages for the business owned by Plaintiff and her husband and could not perform routine household tasks such as cooking.

The ALJ next considered the weight to be given to the various medical opinions regarding the intensity, persistence, and functional limitations of Plaintiff's symptoms and made the following findings regarding the opinions of Dr. Fama and Dr. Woodcock:

As for the opinion evidence, the undersigned has carefully considered the opinion of Dr. Fama contained in the record. Social Security Ruling 96-2p establishes that controlling weight may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record. In this case, Dr. Fama's opinion is not well-supported by her

own clinical observations. In October 2011, she observed that the claimant had full range of motion of the upper and lower extremities, no significant muscle spasm and no crepitus in the shoulders. She also noted that although the claimant was having some difficulty with coverage for chiropractic treatment, she was receiving relief from this type of treatment. Additionally, the undersigned notes that State Agency reviewing physician, Dr. Fingar asserted that the claimant does retain the residual functional capacity set forth above. Therefore, the undersigned finds that Dr. Fama's opinion is not well-supported by her own clinical observations and is inconsistent with other substantial evidence. As such, it is afforded little weight. For similar reasons, the undersigned has also afforded the opinion of chiropractor, Dr. Daniel Woodcock little weight in this case.

. . .

(AR 17) (internal citations omitted).

The ALJ determined at step four that Plaintiff was capable of performing her past relevant work as an office clerk, which was not precluded by her RFC, and thus concluded that Plaintiff was not disabled.

### E.    The Magistrate Judge's R & R.

The Magistrate Judge determined that the ALJ correctly applied the five-step analysis and applied the correct legal standards in evaluating the opinions of Dr. Fama and Dr. Woodcock. He observed that under the treating physician rule, "[w]hen an ALJ decides to afford less than controlling weight to a treating physician's opinion," the ALJ must consider several factors contained in 20 C.F.R. § 404.1527(c)(2)-(6), including the length and extent of the treatment relationship, the frequency of examination, whether the opinion is supported by explanation or evidence, whether the opinion is consistent with the record as a whole, whether the treating physician is a specialist, and other relevant factors. The Magistrate Judge found that "[t]he ALJ's decision clearly states her reasoning[,]" (Doc. 11 at 8), namely that Dr. Fama's opinion as to Plaintiff's RFC was not well-supported by the evidence, including Dr. Fama's previous findings, and inconsistent with other evidence in the record, including the opinion of Dr. Fingar.

The Magistrate Judge also found that the ALJ established her "adherence to the applicable regulatory law," (Doc. 11 at 8-9), as she stated that she "considered opinion

evidence in accordance with the requirements of 20 CFR [§] 404.1527[.]" (AR 16.) He concluded that the ALJ's decision to afford Dr. Fama's opinion "little weight" was supported by substantial evidence because Dr. Fama's treatment notes indicated that Plaintiff had full range of motion in her hands, wrists, and extremities, that her shoulder pains and headaches were relieved with consistent chiropractic treatment, that Plaintiff's symptoms would resolve with time, and that her symptoms may have been partially related to anxiety and stress at home. He observed that many of Dr. Fama's treatment notes were based on Plaintiff's self-report of her symptoms, and the ALJ did not find Plaintiff to be entirely credible. The Magistrate Judge noted that other treating medical providers indicated mostly normal physical findings, and that Dr. Fingar's medical opinion comported with the ALJ's findings.

With regard to the ALJ's decision to afford "little weight" Dr. Woodcock's opinion, the Magistrate Judge concluded that because Dr. Woodcock was a chiropractor and not an "acceptable medical source," the ALJ was not required to afford controlling weight to his opinion. He found that the ALJ's decision to afford Dr. Woodcock's opinion little weight "for similar reasons" for her conclusion regarding Dr. Fama's opinion was legally sufficient:

> Applied here, I find that the ALJ did not err in her analysis of Dr. Woodcock's opinion: the ALJ stated that she gave "little weight" to the opinion for "similar reasons" that she gave little weight to Dr. Fama's opinion, i.e., because it was not well-supported by Dr. Woodcock's own treatment notes and was inconsistent with other substantial evidence. (AR 17.) As discussed above, these are two of the several factors that ALJs consider in evaluating the reliability of a medical source's opinion. *See* 20 C.F.R. § 404.1527(c)(3)-(4). [Plaintiff] cites no legal authority, and I am aware of none, prohibiting an ALJ from using the same reasons to discredit the opinions of multiple medical sources, particularly where, as here, the opinions are substantially similar.

(Doc. 11 at 15.)

Finally, the Magistrate Judge found that the ALJ's decision with regard to Dr. Woodcock's opinion was supported by substantial evidence. He noted that, as with Dr. Fama, Dr. Woodcock's treatment notes contained many statements indicating that

Plaintiff was adequately managing her symptoms. He also pointed to instances in the record in which Plaintiff stated that Dr. Woodcock's treatment was helping to alleviate her symptoms and that she had decreased the frequency of her appointments with him.

## III. Analysis and Conclusions of Law.

In objecting to the R & R, Plaintiff contends that the ALJ's decision was based on two instances of legal error, and the decision should be set aside because the errors were not harmless. First, Plaintiff contends that the ALJ failed to correctly apply the treating physician rule under 20 C.F.R. § 404.1527 with regard to Dr. Fama's opinion and that the Magistrate Judge incorrectly applied a "substantial evidence" standard to review this opinion rather than determining whether it was harmless error. Second, Plaintiff contends that the ALJ's reasoning regarding the weight given to Dr. Woodcock's opinion is insufficient under SSR 06-03p and that error cannot be considered harmless. She contends that the Magistrate Judge erred in concluding that a reviewing court could "follow the reasoning" of the ALJ in analyzing the weight to be given to Dr. Woodcock's opinion.

### A. Standard of Review.

A district judge must make a *de novo* determination of those portions of a magistrate judge's report and recommendation to which an objection is made. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1); *Cullen v. United States*, 194 F.3d 401, 405 (2d Cir. 1999). The district judge may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *accord Cullen*, 194 F.3d at 405. A district judge, however, is not required to review the factual or legal conclusions of the magistrate judge as to those portions of a report and recommendation to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Unless any error is harmless, if the "evidence has not been properly evaluated

because of an erroneous view of the law . . . the determination of the [Commissioner] will not be upheld." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

## B.     Whether the ALJ Correctly Applied the Treating Physician Rule.

The ALJ was required to evaluate Dr. Fama's opinion under the standards set forth in 20 C.F.R. § 404.1527 which is referred to as the "treating physician rule." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004). "According to this rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight'" as long as it "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(c)(2)). Plaintiff contends that the ALJ committed legal error in evaluating Dr. Fama's opinion because the ALJ did not address each of the 20 C.F.R. § 404.1527(c) factors to be considered when a treating physician is not given controlling weight, and "the application gives no indication that these other factors, which *must* be considered, ever were." (Doc. 12 at 3.)

The Second Circuit has held that:

> [W]hen a treating physician's opinion is not given "controlling" weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive. *See* 20 C.F.R. § 404.1527([c])(2). The ALJ must consider, inter alia, the "[l]ength of the treatment relationship and the frequency of examination"; the "[n]ature and extent of the treatment relationship"; the "relevant evidence . . ., particularly medical signs and laboratory findings," supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues. *Id.* § 404.1527([c])(2)(i)-(ii), (3)-(5).
>
> . . .
>
> After considering the above factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33; *see* 20 C.F.R. § 404.1527([c])(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion" (emphasis added)). Failure to provide such "'good reasons' for not crediting the opinion of a claimant's treating physician is a

ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error").

*Burgess*, 537 F.3d at 129-30.

However, while an ALJ must "consider" the 20 C.F.R. § 404.1527(c) factors and give "good reasons" for the weight she accords to the opinion of a treating physician, she is not required to explicitly mention each of the factors when setting forth her reasons. *See Halloran*, 362 F.3d at 32-33 (upholding decision where ALJ did not mention the 20 C.F.R. § 404.1527(c) factors and "it is unclear on the face of the ALJ's opinion whether the ALJ considered (or even was aware of) the applicability of the treating physician rule," but nevertheless gave "good reasons" for her decision to give little weight to a treating physician's opinion such that "the substance of the treating physician rule was not traversed"). Moreover, although Plaintiff is correct that the ALJ did not separately address each of the 20 CFR § 404.1527 factors, "there is a distinction between what an [ALJ] must consider and what [an ALJ] must explain." SSR 06-03p, 2006 WL 2329939, at *6; *Atwater v. Astrue*, 2013 WL 628072, at *2 (2d Cir. Feb. 21, 2013) ("[Plaintiff] challenges the ALJ's failure to review explicitly each factor provided in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

Here, the ALJ recited that she had "considered opinion evidence in accordance with the requirements of 20 CFR § 404.1527." (AR 16.) Her decision properly reflected Dr. Fama's role as a treating physician, the nature of Dr. Fama's relationship with Plaintiff, and the frequency and duration of the treating relationship. *See* AR 13; 17 (summarizing Dr. Fama's treatment of Plaintiff from March 2009 until November of 2011). There was no challenge to Dr. Fama's qualifications to render an opinion as a specialist in rheumatology. The ALJ then discussed the "relevant evidence . . . particularly medical signs and laboratory findings," and "the consistency of the opinion with the record as a whole." 20 C.F.R. § 404.1527([c])(2)(i)-(ii), (3)-(5). Specifically, she pointed out that Dr. Fama's November 2011 opinion was not supported by her own

clinical findings and that Dr. Fama's October 2011 treatment notes revealed that Plaintiff had a full range of motion of the upper and lower extremities, no significant muscle spasms and no crepitus in the shoulders. The ALJ noted that Dr. Fama found that chiropractic treatment provided Plaintiff with some relief but that Plaintiff was experiencing difficulty in obtaining insurance coverage for the treatment. In another section of her decision, the ALJ cited Dr. Zweber's finding in February 2011 that the range of motion of Plaintiff's spine was intact and a May 2011 finding of "5/5 motor strength and fluid range of motion of the shoulder." (AR 15.)

A more thorough review of the record underscores that while the ALJ could have provided a more elaborate explanation of her decision to afford Dr. Fama's November 2011 opinion "little weight," she in fact cited "good reasons" for doing so that were fully supported by the record. Nothing more is required. *See Buchan v. Astrue*, 2011 WL 3714472, at *5 (D. Kan. Aug. 24, 2011) ("It is a practical impossibility for an ALJ's decision to discuss, summarize, or even cite all of the evidence in a record[.] Therefore, . . . the decision must demonstrate that the ALJ considered all of the evidence, but the ALJ is not required to cite *all* of the evidence supporting each of his findings."). For example, Dr. Fama's treatment notes repeatedly document her inability to identify the etiology of many of Plaintiff's symptoms and consistently cite a lack of clinical findings that would support them. Approximately two months prior to rendering her opinion, Dr. Fama authored a statement that supports a conclusion that Plaintiff's chiropractic treatment was adequately addressing at least her headaches and no other symptoms that require chiropractic treatment are mentioned. Plaintiff's own 5/15/11 written statement in Dr. Woodcock's treatment records echo the conclusion that chiropractic treatment was effective and Plaintiff's need for it was lessening.

The degree to which a treating physician's opinion is consistent with the record as a whole is among the 20 C.F.R. § 404.1527(c) factors. Although an ALJ "cannot reject a treating physician's opinion on the sole basis that it conflicts with the physician's own clinical findings," *Losquadro v. Astrue*, 2012 WL 4342069, at *10 (E.D.N.Y. Sept. 21, 2012) (citing *Balsamo*, 142 F.3d at 80), courts have found "good reasons" for rejecting a

treating physician's opinion where "the ALJ did not reject the treating physicians' opinions simply because of a lack of supporting clinical and diagnostic tests, but also on the basis of inconsistencies with other significant medical evidence" such as inconsistency with other medical reports. *Id.; Pena ex rel. E.R. v. Astrue*, 2013 WL 1210932, at *18 (E.D.N.Y. Mar. 25, 2013). Although her explanation was brief, the ALJ adequately supported her conclusion that Dr. Fama's medical opinion was inconsistent with her own clinical findings and with Plaintiff's reported daily activities, as well as inconsistent with Dr. Fingar's opinion which the ALJ afforded great weight. The ALJ therefore provided "good reasons" for giving Dr. Fama's opinion "little weight" and did not commit legal error in her analysis. *See Pena*, 2013 WL 1210932, at *18 (finding "good reasons" for affording a treating physician's opinion little weight include a supported finding that the treating physician's "opinions were inconsistent with her own findings of functional improvement and 'not consistent with other substantial evidence in the record,' including the opinions of [other] medical expert[s.]"); *see also Losquadro*, 2012 WL 4342069, at *10 (upholding ALJ's rejection of treating physician's opinions where opinions conflicted with the physician's own clinical findings and were also inconsistent with medical reports of other doctors). As Plaintiff's challenge is to the legal standard employed by the ALJ and not to the ALJ's factual findings, the court does not analyze whether the ALJ's factual findings are supported by substantial evidence but finds no error in the Magistrate Judge's supplemental conclusion that the ALJ's decision was in fact supported by substantial evidence.

### C. Whether the ALJ Properly Analyzed Dr. Woodcock's Opinion.

Plaintiff next contends that the ALJ did not sufficiently explain why she afforded Dr. Woodcock's opinion "little weight" and that error was not harmless. The court agrees the ALJ's explanation was legally inadequate but concludes that this error was harmless. For this reason, the court does not adopt that portion of the R & R addressing Dr. Woodcock's opinion.

Because Dr. Woodcock is a chiropractor, he is an "other source" whose opinion is not accorded the same deference as the opinion of a treating physician. *See* 20 C.F.R. § 404.1513 (listing chiropractors as example of "other sources"); *see also Diaz v. Shalala*, 59 F.3d 307, 313-14 & n.8 (2d Cir. 1995) (noting that the Second Circuit has "recognized the subordinate status that the opinions of chiropractors occupy under the regulations"). Under Social Security Ruling 06-03p, an ALJ's decision "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning[.]" SSR 06-03p, 2006 WL 2329939, at *6. Courts may analyze "other source" opinions using the factors set forth in 20 C.F.R. § 404.1527(c), although "[n]ot every factor for weighing opinion evidence will apply in every case." SSR 06-03p, 2006 WL 2329939, at *5.

Here, the ALJ merely stated, after discussing Dr. Fama's opinion, that "[f]or similar reasons, the undersigned has also afforded the opinion of chiropractor, Dr. Daniel Woodcock little weight in this case." (AR 17) (internal citation omitted). A court may not speculate as to the reasoning of an ALJ and must not engage in a *post hoc* effort to supplement that reasoning. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ – not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."); *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004) ("Affirming this *post hoc* effort to salvage the ALJ's decision would require us to overstep our institutional role and usurp essential functions committed in the first instance to the administrative process.").

The court disagrees with the Magistrate Judge that absent speculation, a reviewing court could "follow the reasoning" of the ALJ and divine her reasons for the weight she attributes to Dr. Woodcock's opinion. Although the Magistrate Judge is correct that nothing prohibits an ALJ from relying upon the same reasons to reject two different

opinions, there must be an ability to identify in the ALJ's decision the evidence and rationale that supports that conclusion.

In this case, the ALJ accorded Dr. Fama's opinion "little weight," in part, because it conflicted with or was unsupported by her own clinical findings. The ALJ cited specific examples for this conclusion. She also pointed to other evidence in the record which contradicted Dr. Fama's opinion. It would be impossible to simply extend this reasoning to Dr. Woodcock's opinion for several reasons.

First, the ALJ does not refer to much less summarize Dr. Woodcock's treatment of Plaintiff so the court can only speculate as to whether the ALJ found his clinical findings to be inconsistent with his opinion. The ALJ also does not discuss the nature of the relationship between Dr. Woodcock and the Plaintiff, its duration and frequency, and whether Dr. Woodcock is qualified to render the diagnosis that he ascribes to Plaintiff.

Second, Dr. Woodcock's treatment notes are difficult to decipher but appear to document repeated albeit periodic reports of pain by Plaintiff supported at times by what appears to be Dr. Woodcock's explanation for the cause. It is not thus clear whether his treatment notes are, in fact, inconsistent with his opinion. What is clear is that his opinion ranges far beyond any clinical findings and objective testing that can be found in his treatment notes to support it. The ALJ does not explain whether she confronted a similar obstacle or whether she even reviewed the treatment notes in question.

Finally, while the ALJ may have concluded that Dr. Woodcock's opinion was inconsistent with the record as a whole, she neither actually reaches that conclusion nor provides an explanation from which it may be derived. Plaintiff is thus correct that a statement that the ALJ is rejecting Dr. Woodcock's opinion for "similar reasons" to those supporting her rejection of Dr. Fama's opinion will not suffice.

However, even if the ALJ's failure to adequately explain the weight given to an "other source" opinion was legal error, a remand is unnecessary where the error was harmless. *See Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (ALJ's failure to adhere to regulations may in some circumstances be harmless); *see also McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("[A]dministrative error may be harmless: we

will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result. That would be a waste of time and resources for both the Commissioner and the claimant. Thus, we look at the evidence in the record to see if we can predict with great confidence what the result on remand will be.").

Dr. Woodcock's opinion contains no statement of the "frequency, precipitating factors, and severity of [his] patient's pain" although the form he filled out specifically requests this information. (AR 1155.) Since the frequency and severity of Plaintiff's pain is central to Dr. Woodcock's opinion regarding Plaintiff's limitations, the omission of this information is significant. Although Dr. Woodcock renders an opinion regarding the emotional factors contributing to Plaintiff's condition, there is no evidence that he is qualified to render an opinion regarding Plaintiff's psychological condition and its effect on her ability to do work. Similarly, there is no evidence that he is qualified to render an opinion that an autoimmune disease is "most likely" cause of Plaintiff's symptoms or that her condition "most resembles Fibryomyal[gia] symptom picture." (AR 1156.) The extensive limitations Dr. Woodcock places on Plaintiff's ability to work and perform activities of daily living appear inconsistent with his prognosis that Plaintiff's "condition is being maintained with treatment rendered." (AR 1155.) Dr. Woodcock's opinion is thus inherently conflicting, contains notable omissions, and contains opinions that he may not be qualified to render.

Dr. Woodcock's opinion also does not appear to be consistent with his treatment notes made at or near the same time as he rendered his opinion. Nothing in his November 2011 treatment notes supports the range and severity of limitations he finds in his November 2011 opinion. His opinion is also inconsistent with Plaintiff's May 2011 written statement that chiropractic treatment is effective in managing her symptoms and that she is visiting Dr. Woodcock with less frequency with an expectation that she will not need to see him more often than once every three weeks by the end of the summer 2011.

Dr. Woodcock's opinion places even more extensive restrictions on Plaintiff's ability to work than did Dr. Fama, including an opinion that Plaintiff was incapable of

even a "low stress" job on her "bad days" and capable of only low stress jobs on her "good days." This conclusion is not supported by Dr. Fama's clinical findings and is not an opinion that she has rendered. Dr. Brock's findings, Dr. Zwbyer's findings, medical testing, and examinations, and Plaintiff's reported daily activities provide no support for the extent of the restrictions he imposes. Although he notes that Plaintiff has "undergone multiple testing techniques for a vast number of conditions" (AR 1156), he does not further note that that testing produced no results that would explain Plaintiff's symptoms. He thus either is not aware of the test results, or he is characterizing them in a manner that is unsupported by the record. As Dr. Fama repeatedly found the etiology of many of Plaintiff's symptoms was "unclear," there does not appear to be any evidentiary basis upon which Dr. Woodcock rendered an opinion that Plaintiff's symptoms were most likely caused by an autoimmune disease. Dr. Woodcock's opinion is thus inconsistent with the record as a whole.

In summary, had the ALJ properly considered Dr. Woodcock's opinion, the outcome of her decision would not have been different and remand would serve no purpose. The ALJ's failure to adequately evaluate Dr. Woodcock's opinion and explain why she was affording it "little weight" is therefore harmless. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (finding harmless error where "we find no reasonable likelihood that her consideration of the same doctor's 2002 report would have changed the ALJ's determination that Petitioner was not disabled during the closed period."); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."); *McKinstry v. Astrue*, 2012 WL 619112 at *6 (D. Vt. Feb. 23, 2012) (finding failure to consider "other source" opinion harmless error where "an analysis by the ALJ of the June 2010 opinion letter would not have changed the outcome of the case.").

## CONCLUSION

For the reasons stated above, the court hereby ADOPTS IN PART the Magistrate Judge's R & R (Doc. 11). Plaintiff's Motion for an Order Reversing the Commissioner's Decision (Doc. 5) is DENIED and the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Doc. 9) is GRANTED.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 3rd day of June, 2013.

Christina Reiss, Chief Judge
United States District Court